ACCEPTED
03-14-00402-CR
7774714
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/10/2015 5:24:44 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00402-CR

In the
Court of Appeals for the Third District of Texas
at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/10/2015 5:24:44 PM
JEFFREY D. KYLE
Clerk

———————————————————

No. 13-0481-K26
In the 26th Judicial District Court
Williamson County, Texas

———————————————————

REX ALLEN NISBETT
*Appellant*
v.
THE STATE OF TEXAS
*Appellee*

———————————————————

STATE'S BRIEF IN RESPONSE

———————————————————

Jana Duty
District Attorney
Williamson County, Texas

John C. Prezas
State Bar No: 24041722
Assistant District Attorney
405 Martin Luther King, Box 1
Georgetown, Texas 78626
(512) 943-1234
(512) 943-1255 (fax)
jprezas@wilco.org

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................ii

IDENTIFICATION OF THE PARTIES..................................................................iv

INDEX OF AUTHORITIES ............................................................................v

STATEMENT REGARDING ORAL ARGUMENT ...........................................1

STATEMENT OF FACTS ...........................................................................1

SUMMARY OF THE ARGUMENT ...............................................................35

ARGUMENT ............................................................................................36

I.   THERE WAS SUFFICIENT EVIDENCE ADMITTED UPON WHICH THE JURY COULD RATIONALLY FIND APPELLANT GUITLY BEYOND A REASONABLE DOUBT ...................................................................................36

A.  The Standard.................................................................................36

B.  The Voluminous Evidence of Appellant's Guilt........................................40

While Appellant may point to any of these portions of evidence and downplay their individual significance, the cumulative force of all of this evidence together allows the jury to move far beyond mere speculation into the realm in which they could reasonably infer and rationally conclude beyond a reasonable doubt that Appellant murdered Vicki Nisbett.................................................51

II.  THE CHALLENGED JURY ARGUMENT DURING THE PUNISHMENT PHASE WAS PERSMISSIBLE AND EVEN IF IT WERE NOT THE TRIAL COURT'S DUAL INSTRUCTIONS TO THE JURY CURED ANY RESULTING HARM OR ERROR.................................................................................51

A.  The Argument was Not a Comment on Defendant's Choice Not to Testify .52

B.  Case Law Establish Power of Curative Instructions to Jury.......................53

C.  Trial Court Gave Two Instructions to Disregard Prosecutors Comment ......55

D.  Appellant Requests the Wrong Remedy ..................................................56

E.  Any Error Not Cured by the Jury Instructions Was Ultimately Harmless....58

III.  THE CHALLENGED QUESTION WAS NOT A COMMENT ON APPELLANT'S CHOICE NOT TO TESTIFY AND APPELLANT DID NOT PROPERLY PRESERVE THE ISSUE FOR APPELLATE REVIEW.................58

A.  The Question was Not a Comment on Appellant's Choice Not to Testify ...58

B.  By Failing to Object, Appellant did not Properly Preserve the Issue for Appellate Review.................................................................................59

IV.   THERE IS NEITHER HARM NOR ERROR IN THE CHALLENGED NOTICE BECAUSE APPELLANT DID HAVE NOTICE OF THE TESTIMONY AT ISSUE AND NEVER OBTAINED AN ORDER BINDING THE PROSECUTOR TO PROVIDE ANY NOTICE AT ALL ...................................60

    A.  There was No Error Because the Trial Court Never Ordered Disclosure .....60

    B.  The State Disclosures Regarding Clement were Sufficiently Accurate to Put Appellant on Notice as to her Testimony.........................................................61

      1.  The State Disclosed Prior to Trial that Megan Clement Would Testify as a DNA Expert.........................................................................................61

      2.  The State's Disclosure Accurately Described Clement's Employer During the Time at Issue ..............................................................................62

PRAYER......................................................................................................63

CERTIFICATE OF COMPLIANCE.................................................................63

CERTIFICATE OF SERVICE .........................................................................63

## IDENTIFICATION OF THE PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), the State offers the following supplement to the parties listed in Appellant's brief.

<u>Attorneys for the State</u>

- Mr. John C. Prezas (appeal), Assistant District Attorney for Williamson County, 405 Martin Luther King, Georgetown, Texas 78626.

- Mr. Daniel Sakaida (appeal), Assistant District Attorney for Williamson County, 405 Martin Luther King, Georgetown, Texas 78626.

# INDEX OF AUTHORITIES

## CASES

*Brooks v. State*, 323 S.W.3d 893, 898-902 (Tex. Crim. App. 2010)------------36, 39

*Calderon v. State*, 950 S.W.2d 121 (Tex. App.—El Paso 1997) --------------------- 53

Davis v. State, 645 S.W.2d 817, 818-19 (Tex.Crim.App. 1983) -------------------- 54

*Fisher v. State*, 851 S.W.2d 298 (Tex. Crim. App. 1993) ---------------------------- 38

*Gardner v. State*, 730 S.W.2d 675, 700 & n.13 (Tex. Crim. App.), *cert. denied*, 484 U.S. 905, (1987) ------------------------------------------------------------------------- 53

*Hacker v. State*, 389 S.W.3d 860, 871 (Tex. Crim. App. 2013) --------------------- 38

*Hawkins v. State*, 660 S.W.2d 65, 79 (Tex. Crim. App. 1983).---------------------- 53

*Hernandez v. State*, 819 S.W.2d 806, 820 (Tex.Crim.App. 1991), cert. denied, 504 U.S. 974 (1992) -------------------------------------------------------------------------------- 54

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) ----------------------36, 37

*Jackson v. State*, 745 S.W.2d 4, 13-15(Tex. Crim. App.), *cert. denied*, 487 U.S. 1241 (1988)------------------------------------------------------------------------------------- 53

*Jackson v. Virginia*, 443 U.S. 307, 319-320 (1979) ----------------------------------- 36

*Laca v. State*, 893 S.W.2d 171, 184 (Tex.App.--El Paso 1995, pet ref'd)----------- 54

*Logan v. State*, 698 S.W.2d 680, 682 (Tex.Crim.App. 1985)----------------------54, 55

*Long v. State,* 823 S.W.2d 259, 268-70 (Tex. Crim. App. 1991)--------------------- 53

*McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997)------------- 36, 38, 39

*McGee v. State*, 774 S.W.2d 229, 238 (Tex.Crim.App. 1989)------------------------ 54

*Norton v. State*, 851 S.W.2d 341, 345 (Tex.App.--Dallas 1993, pet. ref'd)--------- 54

Rent v. State, 982 S.W.2d 382, 385 (Tex. Crim. App. 1998) ------------------------- 57

*Stobaugh v. State*, 421 S.W.3d 787, 862 (Tex. App.—Fort Worth, 2014)---------- 37

*Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988) ----------------------- 53

Winfrey v. State, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013)--------------------- 37

## STATUTES

Tex. Code Crim. Pro. Art. 39.14(b)----------------------------------------------------- 59

Tex. Code Crim. Proc. Art 49.22(b) --------------------------------------------------- 55

Tex. R. App. Pro. 33.1(a)(1) ------------------------------------------------------------ 58

TO THE HONORABLE COURT OF APPEALS:

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rules of Appellate Procedure 39.1 and 39.7, Appellant has requested oral argument in this case. Therefore, to preserve its right to argue, the State requests oral argument although the State believes that the facts and legal arguments are adequately presented in the briefs and record, and that the decisional process would not be significantly aided by oral argument.

## STATEMENT OF FACTS

To more clearly analyze the issues raised, the state wishes to clarify and supplement the facts recited in Appellant's brief with the following:

Carol Johnson testified that she was notified on December 16, 1991, by someone from Williamson County that her daughter, Vicki Lynn Nisbett, the victim in this case, was missing. R.R. vol. 8 p. 38, 40. Carol has not seen, heard, spoken, or received a letter from Vicki since December 1991. R.R. vol. 8 p. 46.

When Carol last saw Vicki, the last week of November 1991, Vicki and Appellant were not living together. R.R. vol. 8 p. 39. Prior to her disappearance Vicki had chosen to file for divorce from Appellant. R.R. vol. 8 p. 40.

Despite the circumstance of Vicki's disappearance, Carol did not hear from Appellant until several months after Vicki went missing. R.R. vol. 8 p. 40. Carol

1

spoke with Appellant for the second time after Vicki's disappearance in May of 1992. R.R. vol. 8 p. 41. During that conversation Appellant told Carol the following: (1) he didn't know where Vicki was, (2) he suspected a person named McDuff had abducted Vicki, (3) Vicki was probably dead, (4) he had hired an investigator to find Vicki, and (5) he had already paid $30,000 in cash in efforts to find Vicki. R.R. vol. 8 p. 41. During this conversation Appellant also told Carol that no evidence was found, and specifically noted that no blood was found in the apartment because when he moved out he and his mother cleaned it thoroughly. R.R. vol. 8 p. 42. Appellant told Carol he was 95 percent sure McDuff was the person who harmed Vicki. R.R. vol. 8 p. 43-44.

Carol asked the name of the investigator to whom Appellant had paid the $30,000 but Appellant never told her. R.R. vol. 8 p. 42. Carol was never contacted by a private investigator and was never able to verify whether or not Appellant had ever actually hired such an investigator. R.R. vol. 8 p. 42.

Appellant told Carol the authorities got a warrant for his DNA, took him to the hospital, and when he refused, brought him back to the jail where officers held him down while they pulled out his hair and took his fingerprints. R.R. vol. 8 p. 43. Appellant told Carol she could have Vicki's personal items but never gave them to Carol. R.R. vol. 8 p. 44.

2

Appellant did not allow Carol to see her three grandsons until seven or eight months after Vicki's disappearance. R.R. vol. 8 p. 44. Appellant required her to meet him and the boys at the Galleria, where Appellant allowed her to spend only one hour with boys. R.R. vol. 8 p. 45. During that time the boys did not speak to Carol; only Appellant spoke. R.R. vol. 8 p. 45. A month later Appellant allowed Carol another visit where the boys played in the yard and Carol spoke with Appellant and Laura Leavit, with whom Appellant had moved in. R.R. vol. 8 p. 45. Appellant began dating Laura Leavit shortly after Vicki's disappearance. R.R. vol. 8 p. 176.

When Carol asked why she was not allowed to spend time alone with her grandsons, Appellant told her he had to protect himself. R.R. vol. 8 p. 45. After that Carol did not see her grandsons together again. She saw one of them, Ryan by himself approximately 8 years later. R.R. vol. 8 p. 46. Prior to Vicki's disappearance Carol did see her grandchildren regularly so the limitations Appellant placed on her visits with them was a significant change in her relationship with them. R.R. vol. 8 p. 49.

Carol made several efforts to get information about Vicki, including contacting multiple people in the Williamson County Sheriff's Office, speaking with Captain Elliot approximately weekly from December 1991 to May of 1992, contacting Vicki's pastor, and coordinating with a reporter from the Austin

3

American Statesman who printed several articles about Vicki. R.R. vol. 8 p. 47, 49. Carol knew Vicki to be a caring mother who would never willingly leave her children behind. R.R. vol. 8 p. 49.

Julie Tower testified that she worked with Vicki for about a year prior to Vicki's disappearance, during which time they became friends. R.R. vol. 8 p. 64-65. They would spend time together at softball games or birthday parties for the children. R.R. vol. 8 p. 65. During the time Julie spent with Vicki, she observed Vicki to be an excellent mother. R.R. vol. 8 p. 69.

Julie and Vicki planned to attend their company sponsored Christmas party on December 14, 1991, together. R.R. vol. 8 p. 65. Julie called Vicki around 2:30 p.m in response to a message Vicki had left. R.R. vol. 8 p. 65. Vicki answered and was upset because Appellant didn't want her to go to the party. Vicki and Appellant had been arguing. R.R. vol. 8 p. 66. Julie told Vicki to gather her things and come to Julie's house, from whence they could leave for the party together. R.R. vol. 8 p. 66.

When Julie called at 5:00 p.m. to confirm the plan, Vicki answered in a hysterical demeanor, continued an ongoing argument with Appellant that Julie was able to hear, and told Julie that Appellant had choked her. R.R. vol. 8 p. 66. Julie told Vicki to get her stuff and come to Julie's residence immediately. R.R. vol. 8 p. 66. When Vicki had not arrived approximately thirty to forty-five minutes later,

4

Julie again called Vicki. R.R. vol. 8 p. 67. This time Appellant answered the phone and told Julie that Vicki had just left, headed for Julie's apartment. R.R. vol. 8 p. 67.

After waiting another 30 minutes or so without Vicki arriving, Julie called again and again Appellant answered. R.R. vol. 8 p. 67. This time Appellant told Julie that Vicki decided to go straight to the party and not go to Julie's residence. R.R. vol. 8 p. 67. Unsurprisingly for 1991, Julie testified that they did not have cell phones at this time. R.R. vol. 8 p. 67. Julie eventually left without Vicki and attended the party, expecting to see Vicki there, but Vicki never showed up. R.R. vol. 8 p. 67-68.

The next morning Appellant called Julie, asking where Vicki was. R.R. vol. 8 p. 68. Julie responded by asking Appellant what he had done with Vicki and Appellant hung up. R.R. vol. 8 p. 68. Some time later, Appellant called Julie asking Julie to bring some Triaminic for Appellant's son. R.R. vol. 8 p. 68. Appellant met Julie at the door, where Julie saw, just inside the door, on a kitchen bar ledge, pictures of Vicki and a candle burning, like a shrine. R.R. vol. 8 p. 68-69.

Wayne Castleberry testified that he met Vicki on a Friday night in December of 1991 at the Sneakers Night Club. R.R. vol. 8 p. 73-74. Vicki approached Wayne and, despite being there with her brother-in-law, had a conversation with Wayne

5

that lead to the two of them exchanging phone numbers. R.R. vol. 8 p. 74-75. During that conversation Vicki told Wayne that she was still married but separated. R.R. vol. 8 p. 76. When Wayne called the number Vicki gave him the following day, Appellant answered the phone, said Vicki wasn't there, and tried to engage Wayne in conversation. R.R. vol. 8 p. 76-77.

Wayne and Vicki continued to speak on the phone from Friday to Monday, had lunch together on Monday, and continued to talk on the phone in the days following their lunch date. R.R. vol. 8 p. 77-79. As their conversations continued, Wayne spoke with Vicki on December 14, 1991, once in the morning and once in the afternoon. R.R. vol. 8 p. 79. During the second of those calls, Wayne heard Appellant listening on the phone, heard Appellant tell Vicki to quit talking about him, and heard Appellant command Vicki in a harsh tone and loud voice to get off the phone. R.R. vol. 8 p. 79-80.

Wayne and Vicki had plans to continue seeing each other when Appellant moved out of Vicki's residence and had made plans to spend time together after the Christmas party Vicki was supposed to attend. R.R. vol. 8 p. 80-81. Wayne never met with Vicki after the party and never heard from her again. R.R. vol. 8 p. 81. Wayne tried to call and find Vicki without success and drove by her residence but only saw a truck that he assumed was Appellant's. R.R. vol. 8 p. 81.

6

David Proctor, a police officer serving with the Williamson County Sheriff's Office in December of 1991 testified that he began serving in that capacity in 1985 and had occasions in his official capacity to see the inside of Vicki's apartment. R.R. vol. 8 p. 85-87. On those occasions Proctor observed that the apartment was in a state of clutter or disarray typical of having a home in which children reside. R.R. vol. 8 p. 87.

On December 16, 1991, Proctor was dispatched to a missing persons call involving Vicki Nisbett and told to contact Rex Nisbett. R.R. vol. 8 p. 88-89. Appellant told Proctor that Vicki left the apartment with a single change of clothing, heading for the Christmas party and he had not seen her since. R.R. vol. 8 p. 89. Proctor gathered identifying information about Vicki and information about her vehicle and entered into the statewide computer system so that if another law enforcement agency encountered Vicki or her vehicle, that agency would, per existant protocol, contact Williamson County. R.R. vol. 8 p. 89-92. Procotor received and followed up on many leads, including contacting many people but no one had seen or heard from Vicki after December 14, 1991. R.R. vol. 8 p. 92.

Proctor also went to Vicki's apartment on December 16th, approximately two days after she went missing, where Appellant was then staying, and noticed that the normally cluttered apartment was suddenly immaculately clean. R.R. vol. 8 p. 93-94. Proctor also noticed that while the bathroom itself was very clean, the

7

vanity top and containers thereon had a great many personal grooming items of the type not normally leave behind when travelling, such as hair brushes, blow driers, and make up. R.R. vol. 8 p.94-95. Further, Proctor observed that Vicki's closet was still quite full. There did not appear to be the kind of large quantity of clothes missing Proctor would have expected had Vicki simply decided to leave. R.R. vol. 8 p. 95.

Proctor spoke with Appellant during this visit. At first Appellant denied any altercations or disputes but later, when Proctor asked again, Appellant admitted that Appellant knew one of Vicki's coworkers was aware that Appellant and Vicki had an altercation on the evening of December 14. R.R. vol. 8 p. 96. Appellant tried to explain away the altercation by telling Proctor that Vicki approached Appellant in anger and Appellant pushed Vicki away defensively. R.R. vol. 8 p. 96-97. Proctor put out a statewide notice to be-on-the-lookout or BOLO to all law enforcement agencies in the State and then handed off the investigation to Richard Elliot, Captain of Criminal Investigations at the time. R.R. vol. 8 p. 97.

Jerry Fryer testified that in December of 1991 he was the pastor of Trinity Christian Center and in that capacity got to know Appellant and Vicki as members of that church. R.R. vol. 8 p. 103-104. Mr. Fryer and his wife developed a friendship with Vicki and Appellant. R.R. vol. 8 p. q105-106. In addition, he provided counseling to Vicki and Appellant together, and later to Vicki

8

individually. R.R. vol. 109-110. The last time Fryer saw Vicki, within two to three days of her disappearance, he observed her to be extremely afraid, crying, with her head down. R.R. vol. 8 p. 110. Fryer offered to help Vicki by using his knowledge of safe places women could go to get away from situations inspiring the type of fear he observed in her, but Vicki refused to accept his offer. R.R. vol. 8 p. 111. During the time Fryer knew Vicki he knew her to be a good mother. R.R. vol. 8 p. 111.

Chief Richard Elliot testified that he had served approximately 32 years as a law enforcement officer in Williamson County, Texas, and had served four years in the Navy, including three tours in Vietnam. R.R. vol. 8 p. 113-114. On December 16, 1991, when Elliot was captain of the Criminal Investigation Division, received calls from Appellant and from Vicki's supervisor at her work, based on which a missing persons investigation was begun with Proctor, handling the initial report. R.R. vol. 8 p. 114-115.

When Elliot took over the investigation he interviewed Appellant, who admitted that he and Vicki were in the process of getting divorced. R.R. vol. 8 p. 116-117, 120. Elliot reviewed the court documents relating to the divorce and learned Appellant was served with a copy of the divorce paperwork, including temporary orders and temporary child support, on November 15, 1991. R.R. vol. 8 p. 120-121.

9

Appellant told Ellliot that despite the divorce, Appellant had asked and Vicki agreed to let Appellant move back into her apartment until after the Christmas holidays so Appellant could be near the children. R.R. vol. 8 p. 121. Appellant told Elliot that Vicki was supposed to go to the Christmas party and that he stayed at the residence with the children and did not leave that night. R.R. vol. 8 p. 121-122. Appellant originally said the evening went fine, then said that he'd heard another person say that he and Vicki had gotten into an argument. Appellant confirmed to Elliot that he and Vicki had argued and then said that Vicki approached him while angry and he pushed her away. R.R. vol. 8 p. 122. Appellant told Elliot that Appellant believed Vicki had run off with some man, something she had done on other occasions, that he thought she was ok, and that he believed she would return before Christmas. R.R. vol. 8 p. 122.

Elliot continued to investigate and spoke with, among others, Jerry Fryer, Julie Coen, now Julie Tower, and Wayne Castleberry. Elliot's recollection of those conversations, and of the written statements given by Julie Coen/Tower and Wayne Castleberry, matched the testimony of those individuals. R.R. vol. 8 p. 121-128.

At one point Appellant contacted Elliot and told Elliot he believed Vicki was staying with a close friend in Galveston named Carri Moore. Elliot contacted Moore but was unable to locate Vicki. R.R. vol. 8 p. 128. Elliot contacted the

10

Texas Department of Public Safety, hereinafter "DPS", specifically their Missing Persons Unit, to have information put in state and national computer systems. Elliot also monitored Vicki's bank records, had DPS do an offline search on Vicki's vehicle to see if any law enforcement agency had stopped it, and reached out to local news media asking anyone with information to come forward. Elliot also spoke with several to multiple individuals following leads that ultimately were not fruitful. R.R. vol. 8 p. 128-130. Elliot specifically spoke with Morris "Bubba" Smith who provided Elliot with a written statement. R.R. vol. 8 p. 131.

Appellant told Elliot that he, Appellant, was going to put up posters but Elliot was not aware of him ever having done so. Appellant also told Elliot that he had hired private investigators and spent large sums of money but Elliot was never able to confirm this claim, in part because Appellant never gave Elliot the name of any such investigator and no such investigator ever contacted Elliot. R.R. vol. 8 p. 132.

Elliot testified that from subpoenaing Vicki's bank records he learned Vicki deposited a paycheck the day before her disappearance in the amount of $807.07. R.R. vol. 8 p. 133-134. The Court admitted without objection State's Exhibit 5, the paystub from the deposited paycheck, and State's Exhibit 6, the bank records. R.R. vol. 8 p. 134. While watching Vicki's bank account, Elliot noticed a check that

11

appeared to be out of sequence and written from a different checkbook, based on numbering, than the one Vicki had been using. R.R. vol. 8 p. 135.

Elliot asked Appellant about it and Appellant said he signed Vicki's name to that check to get gas from a Diamond Shamrock. R.R. vol. 8 p. 135. Elliot made this admission abruptly before Elliot could even finish his question and acted surprised that the Sheriff's Office was monitoring Vicki's accounts. R.R. vol. 8 p. 136, 180. Appellant wrote this check from Vicki's account, not a joint account, five days after Vicki's disappearance. R.R. vol. 8 p. 180. After this conversation, Appellant did not write any more checks on that account and neither did anyone else. R.R. vol. 8 p. 180-181. Elliot recorded this conversation and that recording was admitted without objection as State's Exhibit 7. R.R. vol. 8 p. 136-137. Vicki did not have any credit cards so far as Elliot was aware. R.R. vol. 8 p. 138.

Approximately six weeks after Vicki disappeared Appellant was evicted from the Apartment, at which time Elliot obtained consent from the apartment manager to search the apartment and obtained the assistance of the DPS Crime Lab in conducting the search. R.R. vol. 8 p. 138-139. Elliot was present when persons from the DPS searched and forensically examined the apartment. R.R. vol. 8 p. 141. During his career Elliot has been to hundreds of crime scenes and been present when investigators processed a large number of such scenes. R.R. vol. 8 p. 144-145. State's Exhibits 8 through 19, photographs of the scene as it was when

12

this examination was conducted were admitted without objection. R.R. vol. 8 p. 141-144. While Elliot was present he observed the collection of carpet pieces from the entranceway and the closet, padding from underneath the carpet, and two pieces of sheetrock. R.R. vol. 8 p. 146-147. Some of those items were sent for testing. R.R. vol. 8 p. 147.

While they were conducting this search, Appellant showed up twice at the residence and expressed great curiosity about what law enforcement had found in the apartment. R.R. vol. 8 p. 139-140. Both times he showed up Appellant tried to convince Elliot not to bother with the search. R.R. vol. 8 p. 139-140. Based on the curiosity Appellant expressed, Elliot invited Appellant to come by his office so that they could sit down and discuss what Elliot had found. R.R. vol. 8 p. 140. However, instead of Appellant showing up to discuss matters, a private attorney called Elliot, explained that Appellant would not be showing up, and forbid Elliot from talking to Appellant any further. R.R. vol. 8 p. 140.

In January of 1992, Elliot enlisted the help of a Mrs. Johnson to get a message to Appellant that the police had found Vicki's body in hopes that Appellant would check on the place where he had disposed of Vicki's body, thereby revealing it to the law enforcement. In fact, when law enforcement watched Appellant, they learned Appellant's vehicle was broken down, and observed Appellant obtained a ride down a road that had several large wooded

13

areas. R.R. vol. 8 p. 148. Elliot searched portions of the very large wooded area with cadaver dogs but did not locate Vicki's body. R.R. vol. 8 p. 148.

During the investigation, the Sheriff's Office released the license plate information for Vicki's car in hopes of locating it. Despite claiming to have paid $30,00 to a private investigator to find Vicki, Appellant contacted the Sheriff's office upset and demanding to know why they had released her license plate information. R.R. vol. 8 p. 149.

The Sheriff's Office located Vicki's car in February of 1992 in an HEB parking lot, found that Appellant's name was also on the registration, and asked Appellant for consent to search Vicki's vehicle. Again, despite claiming to have a strong interest in finding Vicki, Appellant denied consent to search the vehicle, and told Elliot that he needed to speak with his attorney. Rather than wait to hear from Appellant's attorney, Elliot obtained a search warrant and had the same individuals that examined and searched Vicki's apartment assist Sheriff's office personnel in processing the vehicle. R.R. vol. 8 p. 148-150.

Inside the car, law enforcement observed that the light bulb was removed from the dome light, which would have prevented it from turning on when the car door was open. R.R. vol. 8 p. 150. Elliot was present while the car was examined and testified as to the accuracy of the photographs taken of the car, which were

admitted without objection as State's exhibits 20 through 30. R.R. vol. 8 p. 151-152.

At some point during Elliot's investigation, Appellant changed his story from asserting to Elliot that Vicki had just run off with some man and would return at some point, to a claim that Kenneth McDuff, a serial killer in the news at the time, had killed Vicki and left her body on the roadside. R.R. vol. 8 p. 155-157. Elliot never had any leads or evidence pointing towards Kenneth McDuff. R.R. vol. 8 p. 157.

After his arrest Elliot interviewed Appellant, laid out the fruits of his investigation and explained what he believed happen. Appellant expressed great anger at statements made on television that he was homeless but never expressed any anger at being described as a murderer. Further, during the approximately twenty two years that Elliot worked on this case prior to Appellant's arrest, never once did directly tell Elliot that he did not kill his wife, Vicki. R.R. vol. 8 p. 160-161.

Randy Traylor testified that although currently employed as an investigator with the Williamson County District Attorney's Office, from 1982 to 2005 he was employed as a Sergeant Investigator by the Williamson County Sheriff's Deparment where he was given several investigative assignments related to this case. R.R. vol. 8 p.182-183. Traylor was present when the DPS personnel analyzed

and processed Vicki's apartment and took measurements. He went there a second time six days later to collect a control sample of carpeting that he submitted to the DPS to assist with their analysis of other carpet samples taken. R.R. vol. 8 p. 185-186, 202-205.

Mr. Traylor confirmed the accuracy of State's Exhibits 32 through 37 and 39 through 41, photographs of the inside and outside of Vicki's apartment taken at the time it was processed and photographs of the carpet sample collected, which were admitted into evidence without objection. R.R. vol. 8 p. 187-188, 203-204. Mr. Traylor also prepared a diagram of Vicki's apartment, marked with points where evidence was collected, which was offered and admitted into evidence. R.R. vol. 8 p. 195-198. Mr. Traylor testified that the apartment, and particularly the bedroom, was small even without the furniture that would have been in it at the time of Vicki's disappearance. R.R. vol. 8 p. 200-201. Traylor also testified that from the bottom of the stairs in the apartment a person could only see someone standing in the doorway and it would be difficult to see much else. R.R. vol. 8 p. 218.

Traylor also confirmed, consistent with Elliot's testimony, that the Sheriff's Office entered Vicki into the DPS Missing Persons Clearing House, which has access to information the Sheriff does not, such as credit checks. The Sheriff's Department also did an off-line search of Vicki's license plate to see if any law enforcement agency had run her license plate. R.R. vol. 8 p. 206-207. Traylor

16

obtained Vicki's dental records and entered that information into the National Crime Information Center or "NCIC" in case any other law enforcement agency might recover a body for comparison. The Sheriff's Office received dozens of calls regarding unidentified bodies, but each time a comparison was made between Vicki's dental records and the body, that comparison revealed the body was not Vicki. R.R. vol. 8 p.207-208, 210-211.

Traylor also witnessed a phlebotomist collect blood from both of Vicki's parents for use in DNA analysis, as blood was necessary for such analysis at the time, collected the blood, and transported it to the DPS for analysis. R.R. vol. 8 p. 208, 210, 217-218, vol. 10 p. 147-152. The blood kit and blood vials were admitted as State's exhibit 70. R.R. vol. 10 p. 174-179. Traylor verified the vials used as a predicate to their admission and that evidence was admitted as State's exhibit 75 and 76. R.R. vol. 11 p. 86-90.

Traylor had two conversations with Appellant after Vicki's disappearance. R.R. vol. 8 p. 211. During the first conversation Appellant was unhappy that his wages had been garnished to pay for child support and wanted help getting that money back now that he had to care for his children. Appellant also stated he wanted to confront Chief Elliot about lies he claimed people from the Sheriff's Department were telling his neighbors about him. Finally, Appellant made a vague representation to Traylor that Appellant had "some financial stuff" that he believed

a private investigator could use to locate Vicki within a couple of days and was considering hiring such an investigator. R.R. vol. 8 p. 211-212. Appellant did not give the name of the investigator or any other details and Vicki was not found. R.R. vol. 8 p. 212-213.

The second time they spoke, Traylor called Appellant seeking information and learned from Appellant the name of Vicki's dentist and that Vicki had been arrested for theft when she was approximately twenty years old. Using this information Traylor obtained a set of Vicki's fingerprints and her dental records, which he released to the Missing Persons Clearing house so it could be included in the NCIC entry. R.R. vol. 8 p. 213-214. If law enforcement anywhere in the United States that had access to NCIC found Vicki they would have her fingerprints and dental records and contacted the Sheriff's Department about it. The Department never received such information. R.R. vol. 8 p. 215.

Kelly Misfeldt testified that he lived in the same apartment complex and shared a common wall with Vicki Nisbett. R.R. vol. 9 p. 6. Misfeldt spoke with Appellant on December 14, 1991, the day of Vicki's disappearance and Appellant apologized for the noise from the Nisbett's apartment. R.R. vol. 9 p. 7. Misfeldt did testify he saw a person he believed to be Vicki standing outside his apartment 15 days after Vicki disappeared. R.R. vol. 9 p. 8-9. However Misfeldt also conceded that he did not know the Nisbetts well, they were merely acquaintances,

18

it was almost 5:00 p.m. in the winter time of December, it was starting to get dark, the person he saw was dressed in a black jacket, black slacks, and black shoes, there were no street lights or lighting on the apartment building, that the person he saw was standing thirty to thirty-five feet away from the apartments, he was looking from his second story window, the person he saw did not approach or talk to anyone, enter an apartment, get into a car, or knock on a door, and he gave a statement to the police in which he stated he could not be 100 percent sure it was Vicki. R.R. vol. 9 p. 9-11, 14-17. Misfeldt denied that from this vantage point the carport in the parking lot would obscure his view, but State's exhibit 37 is a photograph of the area described, including the car port and calls into question the clarity of Misfeldt's view. R.R. vol. 9 p. 16; R.R. vol. 16.

After seeing this, Misfeldt encountered Appellant and remarked on what he had seen. Appellant told Misfeldt he was going to call the authorities, but Misfeldt never verified whether or not Appellant did so. R.R. vol. 9 p. 12. Misfeldt did tell Appellant what the person she saw was wearing and Appellant responded by saying those were the same clothes Vicki was wearing on December 14th, when she disappeared. R.R. vol. 9 p. 13.

Morris "Bubba" Smith testified that he lived in the same apartment complex as Vicki and Appellant, and while they were acquaintances at first, he came to know Appellant better because Appellant would stop by to talk. R.R. vol. 9 p. 25-

19

28. Appellant asked to borrow Smith's car around mid-December. R.R. vol. 9 p. 30. Smith did not recall that he watched Appellant's sons but testified without objection when asked by both the State and Appellant's counsel, that his sister reminded him that he did watch Appellant's sons once and that his sister rented and brought over a movie for them to watch. R.R. vol. 9 p. 30, 38. Smith did have to review the statement he wrote at the time to refresh his memory of events that occurred approximately twenty two years prior to the trial.

Smith did recall checking on his car the morning after he lent Appellant his car and watched Appellant's sons. When he did so, Smith found damage to the headlights and that the lock on the trunk had been knocked out. R.R. vol. 9 p. 30-33. Smith was confident in his memory of the damage to the trunk's lock. R.R. vol. 9 p. 43. Smith's car had two keys, one for the ignition and one for the trunk. R.R. vol. 9 p. 33. Smith did not recall ever seeing Vicki after the day Appellant borrowed his car.

Lana Faye Reed, Smith's sister, testified that she was living with him in the same apartment complex as Vicki and Appellant in December of 1991 and January of 1992. R.R. vol. 9 p. 51-52. Reed clearly remembered Appellant asking to borrow Smith's car and asking Smith to watch Appellant's sons for him, because she did not know Appellant or Vicki very well. R.R. vol. 9 p. 52-53. Reed went and got a movie from a video store for the children to watch. R.R. vol. 9 p. 53.

20

State's Exhibit 42, the receipt from the video store showing the movies Reed rented at 7:52 p.m. on December 14, 1991, was admitted into evidence without objection. R.R. vol. 9 p. 54-56. Smith watched Appellant's sons for an hour to an hour and a half. R.R. vol. 9 p. 56.

Robert James testified that back in 1991 he worked for the same company as Appellant and on at least one occasion Appellant discussed with James problems in Appellant's marriage. R.R. vol. 9 p. 62-63. Specifically, Appellant told James that he caught his wife cheating and he thought about killing her but that wouldn't be the Christian thing to do. R.R. vol. 9 p. 71.

Mark Johnson, Vicki's brother, testified that he went with Appellant to land owned by Appellant's brother Mike, and while there observed many excavating holes. Upon seeing these holes Appellant commented to Johnson that someone had already done half the work and somebody could throw a body in there and no one would ever find it. R.R. vol. 9 p. 83-85. During the course of their relationship as in-laws, Appellant discussed the possibility of divorce with Johnson. Appellant told Johnson that he would kill Vicki before he let her divorce him and take his three boys. R.R. vol. 9 p. 85.

After Vicki's disappearance, Johnson returned to the same property with the holes, and knocked on the door seeking permission to look aroud the property for signs of Vicki. Johnson heard commotion inside the house but no one answered

21

his knock. Johnson was initially going to go around the side of the house but he overheard someone direct someone else to call the police and Johnson got scared and left. R.R. vol. 9 p. 85-86. There was a barn-like garage on the property that Johnson wanted to search. He was never given permission to stay on the property or to search it or the garage for evidence relating to Vicki. R.R. vol. 9 p. 86. Johnson knew her to be a good mother to her three sons and not the kind of person or mother to abandon her children or her family for over twenty years. Johnson has not heard form his sister since December of 1991. R.R. vol. 9 p. 87-88.

Donnie Rodriguez testified that he was retired from the Cedar Park Police Department, where he was employed on December 14, 1991. At that time, while he was on patrol he noticed a vehicle that slowed and would not pass him and had a yellow ribbon tied onto the antennae. Rodriguez ran the license plate of the vehicle a between 9:30 and 9:35 p.m. and it came back to Vicki Nisbett, the victim. R.R. vol. 9 p. 104-105, 107. The vehicle was headed northbound on South Bell or 183 towards 1431. R.R. vol. 9 p. 105. State's exhibit 43, a map of the area described by Rodriguez was entered into evidence without objection. R.R. vol. 9 p. 106. Rodriguez recalled the driver as the only occupant and that the driver had dark colored hair cut short. R.R. vol. 9 p. 110. When shown a picture of Vicki, admitted as State's Exhibit 2, Rodriguez agreed that Vicki had short hair. R.R. vol. 9 p. 111.

Diane Kagan testified that back in late 1991 she was a coworker of Vicki's. She saw what she recognized as Vicki's car on December 28th in a parking lot of HEB. R.R. vol. 9 p. 115-116. Kagan went to the same HEB on January 3, 1992, looked for Vicki's car and noted it was not there. Kagan went back to the same HEB on January 4th and this time saw Vicki's car parked in the same spot she had seen it on December 28th. R.R. vol. 9 p. 117-118. During each of these visits to HEB, Kagan went into HEB to buy groceries. She did not see Vicki in the store on any of these occasions and she has not seen Vicki since December of 1991. R.R. vol. 9 p. 118-119.

Devon Clarke testified that he was employed as a forensic scientist for DPS in 1992. R.R. vol. 10 p. 7-8. Clarke went to Vicki's apartment to process the scene, noticed stains on the carpet and on the sheetrock on the walls that tested presumptively positive for blood. R.R. vol. 10 p. 8-13. Having found a presumptive positive, Clarke packaged the samples, sealed it, and returned it to his lab where he conducted further testing. R.R. vol. 10 p. 15-16. This further testing revealed that item 1, a piece of sheetrock taken from the upstairs bedroom, was human blood R.R. vol. 10 p. 10, 16. Clarke collected item 2, a piece of sheetrock removed from near the light switch containing a hand print or palm print, sent it to the Latent Prints Division for fingerprint analysis first, and then conducted further

testing that revealed the material making up the hand stain was human blood. R.R. vol. 10 p. 18-19, 31.

Clarke also conducted tests with luminal, a very sensitive substance that reacts to the iron in the hemoglobin of blood and functions as a presumptive test for blood; photos of this testing were admitted without objection as State's 44 through 47. R.R. vol. 10 p. 21-22. Clarke collected item 3, admitted into evidence as State's 16, a section of the carpet from the bedroom and that tested presumptive positive for human blood using phenolphthalein. R.R. vol. 10 p. 25-26. Clarke collected item 4, admitted into evidence as State's exhibit 17, the carpet pad from the closet that tested presumptively positive for human blood. R.R. vol. 10 p. 28-29.

Clarke preserved the items collected and sent items 3 and 4 to another lab for DNA analysis by Dr. Arthur Eisenberg. R.R. vol. 10 p. 29, 30-32. Item 5 is a sample of carpet taken from near the bedroom door that tested presumptive positive for blood. R.R. vol. 10 p. 30. As part of his standard practice at the time, Clarke made drawings of where in the apartment he found items 1-5; these were admitted into evidence as State's exhibits 48 through 50. R.R. vol. 10 p. 32-34. The documents made and kept by Clarke's lab as a record of the submission, testing, and results for items 1 through 5 were admitted into evidence as State's exhibit 51. R.R. vol. 10 p. 37-39. Clarke also asked Randy Traylor to collect a

24

negative control sample of the carpet and pad with no stains and, upon receipt, analyzed those as well and guard against the possibility of a false positive. R.R. vol. 10 p. 36, 42, 60, 63.

Clarke assisted in processing and analyzing samples from Vicki Nisbett's vehicle at the Sheriff's Department impound lot. No blood was found, only debris was collected for possible trace evidence, and the debris was not analyzed. R.R. vol. 10 p. 42-44, 67-68. Clarke also assisted Elliot by processing a scene wherein he recovered four items, including bones of some kind, that were held for future analysis. R.R. vol. 10 p. 44, 73-74. Clarke is not an expert on animal bones, could not say whether or not those bones were human or animal, and was not aware of whether or not those bones were ever linked to this case. R.R. vol. 10 p. 73-73, 78-79.

On cross-examination Clarke conceded that the tests he ran were presumptive and not confirmatory and that luminol will react with substances other than blood. R.R. vol. 10 p. 51-55, 58-59. Clarked did testify that he analyzed these samples with both luminol and phenophtalein. R.R. vol. 10 p. 10-13, 25, 28, 30, 38-39 ,58. He further testified that he did confirm the presence of human blood on item 4, the padding beneath the carpet. R.R. vol. 10 p. 76. Clarke testified that based on his expertise, blood is a viscous liquid and it would require a fair amount of blood to soak through a carpet and into the carpet pad. R.R. vol. 10 p. 77. Clarke

25

testified he was not aware of any test that would let him detect the presence of bleach, hydrogen peroxide, or any other cleaning agent to determine if the Nisbett bedroom where he took his samples had been cleaned. R.R. vol. 10 p. 71.

Chief Richard Elliot testified that he sought and obtained a search warrant for the fingerprints, palm prints, blood sample, body hair sample, and pubic hair sample, of Appellant, which was admitted into evidence as State's exhibit 68. R.R. vol. 10 p. 103-106. Elliot was present when the samples were taken. Appellant initially refused to cooperate and said they would have to take the samples by force. Once Elliot explained the consequences of using force against police officers, Appellant relented. R.R. vol. 10 p. 107-109. Sgt Tom Adams was also present, took fingerprints from Appellant, and transported the other samples to the DPS. R.R. vol. 10 p. 108, 110-111, 113.

Tom Adams testified that in 1992 he was employed by the Williamson County Sheriff's Department, a part of his thirty two years in law enforcement. R.R. vol. 10 p. 98. Over that time, he had a great deal of experience taken fingerprints from people as that was his primary duty while at the Sheriff's Department. R.R. vol. 10 p. 99-100. Pursuant to the search warrant Elliot obtained, Adams obtained Appellant's fingerprints while Appellant was in the Williamson County jail via fingerprint cards admitted into evidence as State's exhibits 66 and 67. R.R. vol. 10 p. 100, 115-118, 127. After collection, Adams took the prints to

26

the Department of Public Safety. R.R. vol. 10 p. 119. Adams was also present when Appellant's blood was drawn pursuant to the warrant and transported the vials of blood, admitted into evidence as State's exhibit 71 and 72, to the DPS for analysis. R.R. vol. 11 p. 5-12.

Oscar Kizzee testified that he was previously employed as a latent print examiner for the DPS crime lab and had significant experience with finger prints even in 1992. R.R. vol. 10 p. 84-86. In 1992, Kizzee examined a piece of sheetrock with a stain that appeared to be blood and obtained latent prints therefrom, photographs of which were admitted as State's exhibit 52, 53, 53A, 54 through 58. R.R. vol. 10 p. 91-96, 127-128. He compared the latent prints to the known prints of Appellant that Adams obtained. R.R. vol. 10 p. 124, 134. Adams found that Appellants finger and palm prints matched the latent prints he lifted with sheetrock that appeared to be stained with blood. R.R. vol. 10 p. 130-136. When developing the latent prints, Adams used amido black, a substance that reacts to proteins in the blood. R.R. vol. 10 p. 135

Bryan Strong testified that he is employed by the DPS crime lab doing the job Kizzee used to do. R.R. vol. 10 p. 139-140. Strong reexamined the comparisons previously done of Appellant's prints to the samples collected from Vicki's apartment and concluded that they were match, agreeing with Kizzee's conclusion of the same. R.R. vol. 10 p. 141-145.

27

Texas Ranger Matt Lindemann testified that he has been employed by DPS since 1990. In 2002 he received evidence from Sgt. Lummus of the Williamson County Sheriff's Department, which he identified as State's exhibit 73, and transported it to the DPS crime lab for analysis. R.R. vol. 11 p. 14-19.

Detective Kee with the Sheriff's Department testified that in 2013 he collected swabs from Carol and Earl Johnson that he identified as State's exhibit 74. R.R. vol. 11 p. 20-25.

Megan Clement testified that she is the senior director at Cellmark Forensics, a private laboratory that examined the carpet and padding as well as known samples from Appellant, Carol Johnson, and Earl Johnson. R.R. vol. 10 p. 152-154, vol. 11 p. 46. Clement described the scientific process by which she, in cooperation with the Texas College of Osteopathic Medicine's radiation facilities, generated results and data that she sent to Dr. Eisenberg at the University of North Texas for reverse parentage analysis. R.R. vol. 10 p. 154-162. Vol. 11 p. 45-47. A photocopy of the actual data and result she generated and sent was admitted in evidence as State's 69. R.R. vol. 11 p. 47-48. Clement explained her interpretations of these results to the jury and her conclusion that she could not exclude the blood sample on the carpet as originating from a biological child of Carol Johnson and Earl Johnson. R.R. vol. 11 p. 48-50.

28

Heidi Prather, the program supervisor for the Missing Persons Clearing House at DPS, testified that the Sheriff's Department contacted her agency for help about a month after Vicki went missing. R.R. vol. 11 p. 52-55. The clearing house took several steps in their search for Vicki, all of which came up negative. These included searches on electronic records such as Texas and out of state driver's licenses, banking records, vehicle registration, social security information, credit applications, utilities, employment records, criminal histories, arrests, traffic stops, hospital records, public record databases, Interpol for out of country activity, vital statistics for things like marriages, divorces, children born, and pawn transactions. R.R. vol. 11 p. 55-59.

Because they compare a variety of collected personal data, Prather testified that the clearing house can locate people even if they operate under an alias or assumed name. R.R. vol. 11 p. 59-60. They also entered in to law enforcement databases a wide variety of information pertaining to Vicki, have her fingerprints and dental records for use in comparing with any bodies found, and publicized requests for information about her via a paper bulletin previously and a website currently. R.R. vol. 11 p. 55-56, 60-65. Despite all of these efforts the clearing house has not received any leads or information about Vicki living anywhere and Vicki's body has not been found. R.R. vol. 11 p. 65.

Michael Lummus, currently chief of police in Lockhart, testified that in 2002 he worked for the Williamson County Sheriff's Department. R.R. vol. 11 p. 75. While at the Sheriff's Department he obtained oral swabs for DNA analysis from Carol and Earl Johnson, which were admitted into evidence as State's exhibit 73, and gave them to Ranger Matt Lindemman. R.R. vol. 11 p. 76-85.

Jane Burgett, a forensic scientist in the DNA-serology section of the DPS crime lab with seventeen years experience, testified about her education, training, expertise, explained the basics of her discipline to the jury, and explained how the science had changed over the twenty two years from Vicki's disappearance to the trial. R.R. vol. 11 p. 101-115. Burgett testified that she tested the swabs taken from Carol and Earl Johnson, which she identified and was admitted into evience as State's Exhibit 74. R.R. vol. 11 p. 115-117. Burgett also identified State's Exhibits State's 75 and 76 as blood vials and State's Exhibit 73 as saliva samples of Carol and Earl Johnson she used in her analysis. R.R. vol. 11 p. 117-119. Burgett identified photos she took to document evidence as it was being examined or evidence that was already collected to keep a record of the state of the evidence as it was stored. These were admitted as State's exhibit 77 through 89A. R.R. vol. 11 p. 124-125.

Burgett then explained the analysis she performed and her conclusions regarding the various samples gathered. Item 1, a piece of sheetrock, was

30

determined to contain blood of human origin and there was an unknown female who could not be excluded as a major contributor to that sample. The sample was then sent to the University of North Texas ("UNT") because they have the ability to determine whether that unknown female could be the child of a known sample, that given by Vicki's parents. R.R. vol. 11 p. 125-131.

Item 2, the sheetrock with the palm print was determined to be in blood of human origin. It had a DNA mixture of two people and Appellant could not be excluded as a contributor. R.R. vol. 11 p. 131-138. The probability of selected an unrelated person at random who could be a contributor to this mixture is approximately one in 117.3 thousand for Caucasians. R.R. vol. 11 p. 174-176.

Item 3, a piece of carpet from the closet, had human blood that, when DNA tested, it was determined the same unknown female could not be excluded but Appellant could be excluded because the other contributor to this DNA mixture was another unknown female. R.R. vol. 11 p. 138-141, 166-167, 177-178. This item was also sent to UNT for further testing. R.R. vol. 11 p. 177.

Item 4 is a portion of carpet padding that had blood of human origin and was sent to UNT for further testing. R.R. vol. 11 p. 141. Item 5 is another piece of carpet that was presumptively tested by Devane Clarke at DPS. Mr. Clarke did not collect and freeze a sample for further testing. Burgett did presumptive testing herself but it ws negative. R.R. vol. 11 p.141-142, 163-166.

31

Burgett did testify that because DNA comes from white blood cells but the iron that luminesces with luminol is in the red blood cells it is possible to get DNA from evidence that doesn't always appear to have blood on it. She also testified that it becomes less likely to obtain DNA evidence from blood in carpet if the carpet has been steam cleaned. R.R. vol. 11 p. 171-173.

Appellant's affidavit to a divorce that he filed in Fort Bend County was admitted as State's exhibit 90. R.R. vol. 12 p. 5.

Dr. Arthur Eisenberg testified he is a professor at UNT and Operational Director of the UNT Center for Human Identification, which is responsible for identifying human remains and missing persons for Texas and the United States government and assists the Texas Attorney General's Child Support Enforcement Division by determining the biological parents of certain children. Eisenberg described his extensive education, training, and experience as a pioneer and expert in the parentage testing field, and described the science of DNA and reverse parentage testing. R.R. vol. 12 p. 6-15.

Eisenberg received known samples from Appellant, Carol Johnson, and Earl Johnson, as well as an evidentiary sample of bloody carpet stain and an evidentiary sample of padding with blood soaked into it. He had Megan Clement of the Tarrant County Medical Examiner's Office who worked part-time in his lab, extract DNA from the carpet and padding stains. R.R. vol. 12 p.10. All the

32

samples, both known and evidentiary, yielded human DNA. R.R. vol. 12 p. 15. Eisenberg then conducted his analysis and determined that Appellant could not have been a contributor to the blood on either the carpet or the padding. R.R. vol. 12 p. 15-16. He also determined that the bloodstains originated from the offspring of Carol and Earl Johnson with a probability of 99.999999 probability of parentage. Eisenberg stated he had little doubt that the samples came form the offspring of Carol and Earl Johnson sine the genetic results were approximately 124 million times more likely to have originated from their biological child as opposed to a random, untested, unrelated invidivual of the Caucasian population. R.R. vol. 12 p. 16-18.

Farrah Plopper testified as to her education, training, and experience as a forensic DNA analyst at the UNT Center for Human Identification under Dr. Eisenberg. R.R. vol. 12 p. 22-24. She examined Item 2 and did not observe any potential bloodstains and did not test further. She did note that portions of the sheetrock appeared to have been scraped away before she received it. R.R. vol. 12 p. 24-27. She also acknowledged that the passage of time since collection and testing could impact the results because DNA can degrade. R.R. vol. 12 p. 32.

In 2009 Plopper analyzed the DNA extracted from item 3 and determined that Carol and Earl Johnson cannot be exclude as the parents of the person who left the DNA on the stain thereon. The parentage probability that they are the parents

33

of the person who left that DNA is 99.75% compared to two unrelated, untested, random individuals. R.R. vol. 12 p. 32-34. In 2014, compared the known samples from Carol and Earl Johnson with the unknown female contributor DPS obtained from the sheetrock and carpet samples. Plopper determined that Carol and Earl Johnson cannot be excluded as parents of the person whose DNA is on Item 1 and Item 4. Her analysis showed 99.9999999999 percent of the population would be excluded as being a biological child of Carol and Earl Johnson R.R. vol. 12 p. 34-36.

Brooks Nisbett testified that he is Appellant's brother and visited Appellant often in the fifteen months leading up to trial. In all that time and all those visits, and despite Brooks helping Appellant locate or contact people, Appellant never asked Brooks to help him locate Vicki. R.R. vol. 12 p. 45-48. During that time Appellant told Brooks three times that he is upset the prosecutors referred to him as homeless but never once state he was upset that they have labeled him a murder. R.R. vol. 12 p. 52. Appellant never told Brooks he isn't guilty and ask for help finding Vicki. R.R. vol. 12 p. 52-53.

Samantha Henderson testified that she works for the Austin Police Department handling forensic multimedia. She explained her training and experience in this area and the process of photo enhancement. R.R. vol. 12 p. 56-58. She applied these techniques to States exhibit 21 and produced the images in

34

States exhibits 95 and 96. She explained the process she used to produce these images, which more clearly show a checkbook and State's exhibits 95 and 96 were admitted into evidence. R.R. vol. 12 p. 58-60.

Appellant called his older brother Mike Nisbett, who testified generally about his land, that he made renovations to it in late 1996 or 1997 but denied otherwise digging holes. He also sponsored a photo of portions of his property admitted as Defense exhibit 2. R.R. vol. 12 p. 76-81.

## SUMMARY OF THE ARGUMENT

Appellant's first point of claimed error fails because the cumulative force of the evidence presented in this case is more than sufficient for a rational jury to find Appellant guilty of murder beyond a reasonable doubt. Appellant's second point of claimed error fails because the prosecutor's argument during the punishment phase of the trial was not a comment on Appellant's choice not to testify. The trial court's oral and written instructions to the jury cured any potential error and any resulting error was harmless. In addition, even if there were harmful error, Appellant requests the wrong remedy.

Appellant's third point of claimed error fails because the prosecutor's question during was not a comment on Appellant's choice not to testify and Appellant did not properly preserve the issue for appellate review. Finally,

Appellant's fourth point of claimed error fails because Appellant did, in fact, receive notice prior to trial that Megan Clement would testify as a DNA expert and because the trial court never ordered the State to make disclosures, a prerequisite to showing a violation of the discovery statute.

ARGUMENT

I. THERE WAS SUFFICIENT EVIDENCE ADMITTED UPON WHICH THE JURY COULD RATIONALLY FIND APPELLANT GUITLY BEYOND A REASONABLE DOUBT

### A. The Standard

When considering a challenge to the sufficiency of the evidence, the reviewing appellate court must view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319-320 (1979); *Brooks v. State*, 323 S.W.3d 893, 898-902 (Tex. Crim. App. 2010); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997)(finding the evidence of murder sufficient despite the lack of the victim's body or a witness to the actual killing).

The reviewing court must defer to the trier of fact's resolution of conflicts in testimony, the weight given the evidence, and the reasonable inferences drawn.

36

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This Court may consider events occurring before, during, and after the commission of the offense and can rely those actions of Appellant's that show an understanding and common design to do the prohibited act. *Id.* Each individual fact does not have to point directly or independently to Appellant's guilt so long as the cumulative force of all the evidence is sufficient to support the conviction. *Id.* Circumstance evidence alone can be sufficient to establish guilt. *Id.*

Appellant cites *Stobaugh v. State*, 421 S.W.3d 787, 862 (Tex. App.—Fort Worth, 2014, pet. ref'd.), for the proposition that while juries can draw reasonable inferences from the evidence, they cannot reach conclusions based on mere speculation or inferences unsupported by facts. In this, he is correct. In, *Megan Winfrey v. State*, the case cited by *Stobaugh* for support, the Court of Criminal Appeals said

> "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them," while "[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." Id. at 16. "A conclusion reached by speculation . . . is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt."

*Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). (quoting *Hooper* 214 S.W.3d at 13).

In the *Stobaugh* case itself the only evidence presented was that the defendant and victim were getting divorced, lies the defendant told after the victim

37

went missing, and the defendant's failure to notify anyone of the victim's disappearance or to attend court settings for the divorce. There was no blood, threats, or other evidence that any actual harm had occurred to anyone. *Stogaugh*, 421 S.W.3d at 865. As set forth in subparagraph II below, and set forth above, the facts at issue here clearly distinguish the instant case from *Stobaugh*.

Appellant mistakenly relies on the dicta discussing motive and opportunity in a murder case in *Hacker v. State*, 389 S.W.3d 860, 871 (Tex. Crim. App. 2013), a decision reversing the revocation of a deferred-adjudication based on insufficient evidence that Hacker violated a "no contact" provision of probation. Appellant's Brief p. 15. In *Hacker*, the Court of Criminal Appeals stated that motive for murder is meaningless where there is no evidence at all of the victim's death. *Id.* But the lack of a body or autopsy evidence is not the same thing as no evidence and precedent makes clear that neither does that lack necessarily equate to insufficient evidence. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Fisher v. State*, 851 S.W.2d 298, 303-304 (Tex. Crim. App. 1993)(holding statute requiring State to produce and identify body or remains was expressly repealed and the evidence was sufficient despite such lack).

The *McDuff* case is pertinent here as it involves the testimony of a co-defendant who witnessed McDuff sexual assault and slap the victim but was dropped off while the victim was still alive. The Court of Criminal Appeals

rejected McDuff's claim that the remaining evidence was insufficient, even when coupled with the co-defendant's testimony, due to the lack of a body, autoposy, or a confession. *McDuff*, 939 S.W.2d 607 at 613-615. The court took note of all of the circumstantial evidence, some of which mirrors the evidence in this case such as lack of activity in the victim's bank and charge accounts, testimony from family that the victim would not just disappear and leave everything behind, uncharacteristic cessation of contact, and a DPS serologist testimony that some items found in Appellants car contained small amounts of human blood. *Id* at 612-615.

It is true that in the *McDuff* case the co-defendant actually saw McDuff strike the victim whereas here, Julie Tower only heard Vicki say that Appellant had choked her. R.R. vol. 8 p. 66. However, Tower was also able to hear and observe Vicki's demeanor, which she described as hysterical and is consistent with a reasonable reaction to having just been choked. R.R. vol. 8 p. 66.

In addition to the lack of Vicki's body, Appellant points to testimony by Kelly Misfeldt that he saw Vicki briefly after Vicki went missing. Yet given the volume of other evidence presented, and the circumstances of that viewing, the jury as, as the finder of fact, was able to make a credibility determination regarding the weight to be given Misfeldt's testimony that this court must not disturb or circumvent. *See e.g. Brooks*, 323 S.W.3d at 900-901 (part of holding that factual

39

sufficiency and legal sufficiency review indistinguishable lies in the great amount of deference an appellate court owes to a jury's credibility and weight determinations).

## B. The Voluminous Evidence of Appellant's Guilt

As this Court can readily ascertain from the lengthy Statement of Facts above, the jury had a great deal of evidence in the form of both testimony and exhibits upon which to base their verdict. When viewed in the light most favorable to their verdict, it becomes clear that a rational jury could, and indeed did, find Appellant guilty beyond a reasonable doubt of Vicki Nisbett's murder.

Among this volume of evidence, when viewed in the light most favorable to the jury's verdict, several key points stand out. These include:

- Appellant's Violence the Day Vicki Disappeared
  - The last time Jerry Fryer saw Vicki, just a few days before she disappeared, she was extremely afraid, crying, and had her head down. Fryer was so struck by this he offered to help Vicki get to a safe place he knew through his work as a pastor where women could escape situations inspiring such fear.
  - When Wayne Castleberry called in the afternoon he heard:
    - Appellant listening on the phone

- Appellant chastising Vicki for talking about him

- Appellant commanding Vicki in a harsh tone and loud voice to get off the phone

o When Julie Tower called Vicki later in the afternoon to confirm their evening plans:

- Vicki had a hysterical demeanor.

- Vicki and Appellant continued an ongoing argument loudly enough for Julie to hear

- Vicki told Tower that Appellant had choked her.

- Evidence Gathered at the Apartment

o When Officer Proctor visited Vicki's residence after her disappearance, he found the apartment immaculately clean as opposed to the typical disarray he had come to know as typical for Vicki's residence.

o Appellant told Carol Johnson no blood was found in Vicki's apartment because when he moved out Appellant and his mother cleaned it thoroughly.

- The jury might reasonably infer that Appellant would only clean an apartment from which he was evicted and for which he was not on the lease to hide evidence.

- Proctor noticed Vicki left behind a closet full of clothes and many personal grooming items she would need had she simply left her children behind.

- After Appellant was evicted for not being on the lease, they executed a search warrant for Vicki's apartment and collected samples that, after analysis and testing by a variety of scientists and experts revealed:

  - Appellant's finger and palm prints in Vicki's blood on the sheetrock wall,

  - Vicki's blood on the carpet in the bedroom

  - Vicki's blood on the padding beneath that carpet

- Unusual Cessation of Contact

  - Carol Johnson, Vicki's mother, has not seen, heard, spoken, or received a letter from Vicki since December 1991.

  - Carol told the jury Vicki was a caring mother who would never willingly leave her children behind.

  - Jerry Fryer and Julie Tower also testified that Vicki was a good mother.

  - Elliot entered Vicki's information into the DPS Missing Person's Unit, monitored her bank records, did an search for any law enforcement contacts, and reached out to the news among other steps. Yet, since her

disappearance in 1991, not a single hit has occurred anywhere in the United States of which Elliot or any other witness was aware.

- o Randy Traylor obtained a set of Vicki's fingerprints and dental records and had those sent to the Missing Persons Clearinghouse as well, yet no unidentified body has ever matched this data.

- o Heidi Prather of the DPS Missing Persons Clearing House testified to the many efforts she made and the wide variety of records her agency searched without success in the twenty two years between Vicki's disappearance and the trial. This despite Prather's testimony that her agency can find people even if they use an alias or assume dname.

- The Check
  - o While monitoring Vicki's bank records, Elliot noticed a check written out of sequence, after her disappearance, and written from a different checkbook, based on numbering, than the one Vicki was using.
  - o Appellant admitted he signed Vicki's name to that check and made the admission abruptly before Elliot could even finish his sentence. Appellant expressed surprise Elliot was monitoring Vicki's accounts.
    - Appellant wrote this check on Vicki's account, not a joint account, while they were going through a divorce, and after her disappearance

43

- Once Appellant learned Elliot was monitoring Vicki's accounts he did not write any more checks on her account and neither did anyone else.

- Samantha Henderson's efforts enhancing the checkbook in the photos taken of Vicki's car, State's 21, 95, and 96, show that the checkbook from which Appellant wrote the check was in Vicki's car when it was found long after she disappeared

- If Vicki truly walked out unharmed and Appellant never saw her again and had no idea where she was, how did he get access to the checkbook in the vehicle that went missing around the time she did and was not located until long after her disappearance by someone else? The jury could reasonably infer he had access to the checkbook because he had access to her vehicle and that he had access to her vehicle because he was operating her vehicle after her disappearance.

- Appellant's Excursion the Night of Vicki's Disappearance
  - Despite telling Elliot that he was at Vicki's residence the entire night, Appellant borrowed Morris Smith's vehicle and asked Smith, someone he didn't know that well, to watch his children while he was gone.

Appellant did not know that Smith's sister would bring over a video when he left his children with Smith.

- From these circumstances, the jury might reasonably infer that whatever reason compelled Appellant to borrow a vehicle the same night as Vicki's disappearance was very urgent.

o Appellant returned the car with damaged headlights and the lock to the trunk knocked out. This is significant because that model of car had two keys—one for the trunk and one for the vehicle.

o The jury might reasonably infer that Appellant was hiding and disposing of evidence of his crime during this time.

- Appellant's Incriminating Statements and Misleading Statements

o Appellant told his co-worker Robert James that he caught his wife cheating on him and he thought about killing her.

o Appellant told Mark Johnson, Vicki's brother, that he would kill Vicki before he let her divorce him and take his three boys.

- This is especially significant because at the time of her disappearance, Vicki was seeking a divorce from Appellant, had served Appellant with divorce paperwork, did have custody of the boys, and had a new paramour.

- While on Mike Nesbitt's property, when encountering excavating holes on, Appellant told Mark Johnson, that someone had done half the work and somebody could throw a body in there and non one would ever find it.
- Lies to Carol Johnson
  - Appellant told Carol Johnson that he hired a private investigator to find Vicki but when she asked he could not give her the name of the investigator and no such private investigator ever contacted her.
  - Appellant told Carol Johnson she could have Vicki's personal items but was never able to give them to her.
- Appellant's story to Julie Tower about Vicki's whereabouts after he choked her changed:
  - First Appellant told Tower Vicki had just left for Tower's apartment.
  - Thirty minutes later, when Tower called to check on Vicki, Appellant then said Vicki went straight to the party instead of going to Tower's residence.
  - Tower testified they did not have cell phones at this time so Appellant would have had no way of knowing Vicki had decided

46

to go straight to the party if Vicki had truly left the apartment just before the previous call.

- o Lies to Officer Proctor

    - Denied any altercations or disputes occurred initially, and only upon further questioning did he admit he knew Tower heard the altercation on the phone.

    - Told Proctor he pushed Vicki away defensively—a description quite different from Vicki's statement that he choked her

- o Lies to Chief Elliot

    - Appellant told Elliot that the night Vicki disappeared he stayed at Vicki's residence with the children all night, but actually borrowed Morris Smith's vehicle and left his children in Smith's care

    - First said the evening of Vicki's disappearance went fine, but later admitted he was aware another person said he and Vicki had an argument. Indeed, Tower testified she overheard them arguing while on the phone with Vicki.

    - Eventually Appellant admitted the argument got physical but blamed Vicki saying she approached him angrily and he pushed her.

47

- Appellant told Elliot he paid a large sum of money to a private investigator to find Vicki, but never gave a name or any information about this investigator—preventing Elliot from verifying Appellant's claim or offering information, assistance, or collaboration with the investigator.

- Appellant's Behaviors Commensurate with Consciousness of Guilt
  - Appellant called Julie Tower the morning after Vicki's disappearance asking about Vicki. Julie responded by asking Appellant what he had done with Vicki. Rather than respond or say anything at all, Appellant hung up.
  - Some time after Vicki disappeared Appellant asked Julie Tower to bring him some Triaminic for his son. Appellant met Tower at the door but Tower still observed a shrine on the kitchen bar, complete with pictures of Vicki and a burning candle.
  - Despite the circumstances, Carol Johnson did not hear from Appellant until several months after Vicki went missing.
  - Appellant did not allow Carol Johnson to see her grandsons until seven or eight months after Vicki's disappearance, limited her visits, did not allow her to talk with her grandsons, and did not allow her to be alone with

them. This was a significant change from her relationship with them prior to Vicki's disappearance.

o When Carol Johnson asked Appellant why she could not spend time alone with her grandchildren, Appellant told her he had to protect himself.

o Appellant showed up twice while police were searching Vicki's apartment and tried to discourage them from continuing the search.

o Elliot had a third party get a message to Appellant that police had found Vicki's body. Undeterred by his vehicle being broken down, Appellant got a ride to a several large wooded areas.

o Despite having claimed to have spent $30,000 on a private investigator to find Vicki, Appellant called the Sheriff's office to complain when police released Vicki's license place to the public in hopes of locating Vicki's vehicle.

  ▪ The jury might reasonably infer Appellant was worried Vicki's vehicle would be found, since he was still accessing it, as he must have to get her checkbook and write a check from it.

o Despite claiming to want to find Vicki, when police located Vicki's car and asked Appellant, who was also on the registration, for permission to search the car, he refused to grant consent and said he needed to speak

49

with his lawyer. This despite no charges having been filed and police not having yet confronted him with their suspicions.

- o When Elliot interviewed Appellant after his eventual arrest, Appellant expressed great anger at being labeled homeless on television but never expressed any anger at being accused of murder.

- o When Appellant's brother Brooks visited Appellant frequently in the months between Appellant's arrest and the trial, never once did Appellant ask for help finding Vicki.

  - ▪ Further, just as with Elliot, Appellant expressed anger to Brooks three times about being called homeless but never once expressed anger at being called a murderer.

- Appellant had motive

  - o Appellant and Vicki were going through a divorce.

    - ▪ Appellant admitted this fact to Elliot.

  - o Despite the divorce, Vicki let Appellant move back in with her until after the Christmas holidays so Appellant could be close to their children.

  - o This gave him a front row seat when Vicki had begun seeing other people, especially to her budding romance with Wayne Castleberry.

  - o Appellant began dating Laura Leavit shortly after Vicki's disappearance

While Appellant may point to any of these portions of evidence and downplay their individual significance, the cumulative force of all of this evidence together allows the jury to move far beyond mere speculation into the realm in which they could reasonably infer and rationally conclude beyond a reasonable doubt that Appellant murdered Vicki Nisbett.

II.  THE CHALLENGED JURY ARGUMENT DURING THE PUNISHMENT PHASE WAS PERSMISSIBLE AND EVEN IF IT WERE NOT THE TRIAL COURT'S DUAL INSTRUCTIONS TO THE JURY CURED ANY RESULTING HARM OR ERROR

In his second point of error, Appellant complains about a comment the prosecutor made during closing arguments at the punishment phase of his trial. The prosecutor noted that all the parents of the victim wanted was to know the location of their daughter's remains and began to explain that the defendant had denied them that. R.R. vol. 15 p. 57-58. Appellant objected and his objection was sustained.  Appellant requested and received an oral instruction to disregard. Appellant then requested and was denied a mistrial. R.R. vol. 15 p. 58.

**A.    The Argument was Not a Comment on Defendant's Choice Not to Testify**

Appellant construes the argument as a comment on his choice not to testify in trial.  However, the prosecutor's argument was directed at Appellant's failure to admit his guilt and disclose the location of Vicki's remains when Appellant was interviewed by law enforcement.

As the Statement of Facts above reveals, during the course of the investigation Appellant spoke with multiple law enforcement officials, including a conversation with Randy Traylor and multiple conversations with Richard Elliot. Appellant could have come clean during any of these conversations and it was permissible and proper for the prosecutor to point this out during the punishment phase of the trial.  Further, after Vicki's disappearance, Appellant distanced himself and his children from Vicki's parents.  The prosecutor could permissibly point out in her punishment closing argument that Appellant chose to clam up and stay away from Vicki's parents during the approximately twenty two years that elapsed between Vicki's disappearance and the trial rather than, at any point prior to trial, coming clean and telling them what he did with Vicki.

**B.     Case Law Establish Power of Curative Instructions to Jury**

Even if this Court believes the prosecutor's argument was indeed a comment on Appellant's failure to testify, Appellant misunderstands the law on this point. Appellant cites *Owen v. State*, 656 S.W.2d 458, 459 (Tex. Crim. App. 1983) for the proposition that an improper comment on an accused's failure to testify cannot generally be cured by an instruction to disregard.

Indeed that used to be the prevailing legal theory. However, that general legal rule has been significantly eroded over the years and now applies only in the most blatant examples. *See, e.g., Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988). The court of criminal appeals has, in recent years, frequently held that an instruction to disregard may cure an impermissible comment on an accused's failure to testify. *See, e.g., Long v. State*, 823 S.W.2d 259, 268-70 (Tex. Crim. App. 1991); *Jackson v. State*, 745 S.W.2d 4, 13-15 (Tex. Crim. App. 1998), *cert. denied*, 487 U.S. 1241 (1988); *Gardner v. State*, 730 S.W.2d 675, 700 n.13 (Tex. Crim. App. 1987), *cert. denied*, 484 U.S. 905, (1987); *Hawkins v. State*, 660 S.W.2d 65, 79 (Tex. Crim. App. 1983).

In fact the El Paso Court of Appeals noted this evolution of the law back in 1997, explaining:

> Some current decisions suggest that an instruction may cure, in certain circumstances, even a direct and explicit comment. *See, e.g, Long*, 823 S.W.2d at 269 (finding that the State did not contest the remark's characterization as an impermissible comment on the defendant's

failure to testify, but instead argued that the comment was invited; comment in question was a direct comment on failure to testify); Bower v. State, 769 S.W.2d 887, 907 (Tex.Crim.App. 1989) (finding that comment on defendant's lack of remorse was cured by instruction), cert. denied, 506 U.S. 835, 113 S. Ct. 107, 121 L. Ed. 2d 66 (1992). However, the presumption remains that an instruction to disregard does not cure error with respect to direct, and certain indirect, comments on failure to testify. *See De Los Santos v. State*, 918 S.W.2d 565, 570 (Tex.App.--San Antonio 1996, no pet.).

*Calderon v. State*, 950 S.W.2d 121, 136 (Tex. App.—El Paso 1997, no pet.).

The standard in determining effectiveness of a curative instruction provides that reversible error results from improper prosecutorial argument only where the argument is extreme or manifestly improper, injects new and harmful facts into the case, or violates a mandatory statutory provision. *Hernandez v. State*, 819 S.W.2d 806, 820 (Tex. Crim. App. 1991), cert. denied, 504 U.S. 974 (1992); *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989); *Logan v. State*, 698 S.W.2d 680, 682 (Tex. Crim. App. 1985); *see also Laca v. State*, 893 S.W.2d 171, 184 (Tex. App.—El Paso 1995, pet ref'd); *Norton v. State*, 851 S.W.2d 341, 345 (Tex.App.—Dallas 1993, pet. ref'd).

An instruction fails to cure error only when the prosecutor's argument is so manifestly improper or inflammatory that its prejudicial effect cannot reasonably be cured. *Logan*, 698 S.W.2d at 682. The Court must examine the argument in light of the entire record and the probable impact on the argument had on the minds of the jury. *Hernandez*, 819 S.W.2d at 820; *Logan*, 698 S.W.2d at 682.

54

When considering the impact of the argument on the jury, the court must also consider the nature and extent of the instruction given. *Davis v. State*, 645 S.W.2d 817, 818-19 (Tex. Crim. App. 1983).

## C.  Trial Court Gave Two Instructions to Disregard Prosecutors Comment

In light of the above, it is important that, as acknowledged in Appellant's brief, after the Judge sustained Appellant's objection, he also instructed the jury to disregard the comment. R.R. vol. 15 p. 58. In addition, the Court's Charge on punishment, in paragraph IV, contained an instruction that jury not consider the fact that defendant did not testify as a circumstance against him and forbidding the jury from alluding to, commenting on, or in any manner referring to the fact that the defendant did not testify. C.R. p. 213.

These two instructions, taken together, left no room for the jury to act in the way Appellant fears. The immediate instruction to disregard coupled with the clear and detailed instructions to the jury in the charge provide for a much greater impact on the jury than a single unfinished argument to which the State did not return.  The cases cited in subparagraph III reveal the variety of factual situations in which the Court of Criminal Appeals and other appellate courts have considered

this issue. The argument here is not so manifestly improper and inflammatory as to fall within that narrow category of statements that is incurable.

This is especially true considering that the valid basis for said argument, set out in subparagraph I. above, is, even if ultimately rejected by this court, plausible enough that, when coupled with the trial court's instructions, was unlikely to inflame the jury in the manner required for a reversal. *Cf. Logan*, 698 S.W.2d at 682 (noting that where the court of appeals focused only on one possible inference from the objectionable statement, the Court of Criminal Appeals found that the jury could have drawn another inference from the comment and citing that as part of its decision that the trial court's instruction in that case was sufficient to cure any error).

### D.  Appellant Requests the Wrong Remedy

Even if this Court believes the prosecutor argued improperly and in a way that requires departure from existing Court of Criminal Appeals, precedent, the reversal Appellant seeks is not the proper remedy. *See* Tex. Code Crim. Proc. Art 49.22(b). Since the legislature amended Article 49.22(b) in 1987 to its current form, errors in the punishment phase in a case with an offense date after 1987 entitle a defendant only to a new punishment phase, not a new trial. *Cf. Hartfield v. Thaler*, 403 S.W.3d 234, 238 (Tex. Crim. App. 2013) (noting the difference). This protection of the guilty verdict even extends to prevent a defendant filing a motion

56

for new trial after his punishment phase on remand by an appellate court. *Lopez v. State*, 18 S.W.3d 637, 640 (Tex. Crim. App. 2000) ("We believe that to give effect to Art. 44.29(b), a remand on punishment only must limit a trial court's jurisdiction to only punishment issues").

The Court of Criminal Appeals made clear in 1998 when faced with the question of how to handle an error that occurred in the punishment phase of the trial, to remand for a full trial on both guilt/innocence and punishment, "would be in contravention of the specific mandates of Arts. 44.29 and 44.33(a), and thus of the most basic notions of the 'separation of powers' doctrine and 'hierarchy of legislation.'" *Rent v. State*, 982 S.W.2d 382, 385 (Tex. Crim. App. 1998). The Court of Criminal Appeals has also said,

> If, after remand, the trial court has the authority to reconsider issues from the guilt-innocence portion of the trial, the appellate court's remand "on punishment only" is rendered meaningless. We believe that to give effect to Art. 44.29(b), a remand on punishment only must limit a trial court's jurisdiction to only punishment issues.

*Lopez v. State*, 18 S.W.3d 637, 640 (Tex. Crim. App. 2000), and

> Before it was amended in 1987, Texas Code of Criminal Procedure Article 44.29 required that, when punishment was assessed by a jury and a new trial was awarded on the basis of punishment phase error, the defendant would receive a complete new trial rather than just a new punishment phase.

*Hartfield v. Thaler*, 403 S.W.3d 234, 238 (Tex. Crim. App. 2013).

**E.** **Any Error Not Cured by the Jury Instructions Was Ultimately Harmless**

After Appellant's objection, the prosecutor moved on to other arguments and never revisited this topic. The statement at issue was a small part of the prosecutor's total argument. Considering the scope of that argument, the evidence summarized above, and the valid interpretation of the statement explained above, Appellant cannot show that the statement caused him harm.

**III.** **THE CHALLENGED QUESTION WAS NOT A COMMENT ON APPELLANT'S CHOICE NOT TO TESTIFY AND APPELLANT DID NOT PROPERLY PRESERVE THE ISSUE FOR APPELLATE REVIEW**

**A.** **The Question was Not a Comment on Appellant's Choice Not to Testify**

In his third point of error, Appellant argues that a question to interviewing officer Chief Richard Elliot, amounted to the State commenting on the Appellant's choice not to testify. The question was, "In the 22 and half years that you have worked with or dealt with Rex Nisbett, has he ever said to you, 'Chief, I did not kill my wife?'" Elliot answered that Appellant had not. R.R. vol. 8 p. 161-162.

Given that Elliot testified that he interviewed Appellant after Appellant was arrested and while Appellant was in jail, and that he spoke to Appellant at several

58

points during the investigation, this question properly called the jury's attention to the fact that during the many times prior to trial when Appellant had voluntary conversations with Elliot, Appellant never protested his innocence.

**B.** <u>**By Failing to Object, Appellant did not Properly Preserve the Issue for Appellate Review**</u>

Appellant's argument regarding the prosecutor's question to Elliot ignores the fundamental fact that Appellant never objected to the questions. R.R. vol. 8 p. 161-162. By not objecting and giving the trial court an opportunity to consider this complain, Appellant has failed to meet a prerequisite to presenting a complaint for appellate review, as required by Tex. R. App. P. 33.1(a)(1). Thus, this Court need not address this point further.

IV. THERE IS NEITHER HARM NOR ERROR IN THE CHALLENGED NOTICE BECAUSE APPELLANT DID HAVE NOTICE OF THE TESTIMONY AT ISSUE AND NEVER OBTAINED AN ORDER BINDING THE PROSECUTOR TO PROVIDE ANY NOTICE AT ALL

A. **There was No Error Because the Trial Court Never Ordered Disclosure**

Appellant's argument that the State violated article 39.14(b) of the Tex. Code Crim. Proc. overlooks an important consideration—the trial court never ordered disclosure. Appellant's brief quotes the version of the statute applicable to Appellant's case, yet misses the most important portion of that statute: "On a motion of a party and notice to the other parties, **the court in which an action is pending may order**…" Appellant's Brief p. 24; Tex. Code Crim. Pro. Art. 39.14(b).

Article 39.14(b) requires an order from the trial court to make any disclosure legally binding. Yet, nowhere in the clerk's record or the reporter's record is there an oral or written order from the trial court ruling on Appellant's motion for disclosure of experts. In fact, the trial court itself noted it made no written order but believed there may have been an oral order, though the court had no independent recollection. R.R. vol. 10 p. 168-169. The clerk and reporter's records show there was no order.

The only such ruling is an Order granting the *State's* request for notice of Appellant's expert witnesses, granted on March 31, 2014 and filed with the district clerk on April 1, 2014. Thus, the State could not have violated article 39.14, regardless of the content of its disclosures.

Despite not being required to do so, the State began making disclosures as soon as it received notice of Appellant's request, despite not being ordered to do so. C.R. 67-71, 73-77, 89-90, 95-102, 104-111, 113-120.

**B. The State Disclosures Regarding Clement were Sufficiently Accurate to Put Appellant on Notice as to her Testimony**

**1. The State Disclosed Prior to Trial that Megan Clement Would Testify as a DNA Expert**

In State's Third Notice of Intention to Use Expert Witnesses, filed January 2, 2104, subsection 2(h), the State gave notice of, "Megan Clement: Tarrant County Medical Examiner who collected evidence." C.R. p. 101. In the State's Fourth Notice of Intention to Use Expert Witnesses, filed May 8, 2014, the State gave notice in subsection 2(i) repeating the same language in the January 2 notice, but also added, in subsection 2(d), "Tarrant County Medical Examiner's Office: Megan E. Clement: DNA Analyst." C.R. p. 110. The State's Fifth Notice of

Intention to Use Expert Witnesses, filed May 13, 2014, repeats both subsections regarding Clement contained in the May 8, 2014, notice. C.R. p. 113.

Thus, Appellant had at least two notices, filed well before trial that Megan Clement would testify as a DNA expert. His argument that he was surprised and harmed by such testimony is therefore without merit.

## 2. The State's Disclosure Accurately Described Clement's Employer During the Time at Issue

Appellant takes issue with the disclosure of Megan Clement as a working for the Tarrant County Medical Examiner's Office.

Megan Clement did indeed testify that, at the time of trial, she was the senior director at Cellmark Forensics. R.R. vol. 10 p. 152. However, she also testified that from 1991 to 1994 she was in fact employed by the Tarrant County Medical Examiner's Office. R.R. vol. 10 p. 153. Further, Dr. Eisenberg testified that at the time Clement extracted DNA to assist him in his reverse parentage analysis, Clement worked part-time in his lab while still employed at the Tarrant County Medical Examiner's Office. R.R. vol. 12 p.10.

Thus, during the time at issue Clement was employed as disclosed.

## PRAYER

Wherefore, the State respectfully requests that this Court affirm the conviction.

Respectfully submitted,

**Jana Duty**
District Attorney
Williamson County, Texas

/s/ John C. Prezas
**John C. Prezas**
State Bar No: 24041722
Assistant District Attorney
405 Martin Luther King, Box 1
Georgetown, Texas 78626
(512) 943-1234
(512) 943-1255 (fax)
jprezas@wilco.org

## CERTIFICATE OF COMPLIANCE

I certify that, after allowable exclusions, the State's brief contains 14,387 words in compliance with Rule 9.4 of the Texas rules of Appellate Procedure.

/s/ John C. Prezas
John C. Prezas

## CERTIFICATE OF SERVICE

This is to certify that on November 10, 2015, a copy of the foregoing brief has been sent to Appellant's attorney of record, Kristen Jernigan, 207 S. Austin Ave., Georgetown, TX 78626, by eservice at kristen@txcrimapp.com.

/s/ John C. Prezas
JOHN C. PREZAS